**UNITED STATES of America,
Appellee,**

v.

**Harry F. LARSON, M. D., Appellant.**

**No. 73–3109.**

United States Court of Appeals,
Ninth Circuit.

May 22, 1974.

As Amended Nov. 21, 1974.

Warren A. Sinsheimer, III, San Luis Obispo, Cal., for appellant.

William S. Hawes, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

## OPINION

Before BARNES and ELY, Circuit Judges, and EAST,* District Judge.

PER CURIAM.

Dr. Harry F. Larson, an M.D. licensed to practice medicine in California, was convicted of nine substantive counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1)[1] and of conspiracy to violate 21 U.S.C. § 841 (a)(1) as proscribed by 21 U.S.C. § 846.

### I. Sufficiency of the Evidence

Dr. Larson's principal argument on appeal questions the sufficiency of the evidence. He urges that because of the absence of expert medical testimony the government failed to carry its burden of proof that the prescriptions written by Dr. Larson were issued without a legitimate medical purpose, and not in the usual course of his professional practice.

The regulation (21 C.F.R. § 306.04 (a)[2]) issued pursuant to 21 U.S.C. § 829(a) and (b) exempts medical practitioners from the prohibitions of 21 U.S.C. § 841(a)(1) by allowing a practitioner to issue a prescription "for a legitimate medical purpose," and "in the usual course of his professional practice." On appeal we must review all the evidence and all the reasonable inferences that are to be drawn therefrom, in a light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Amaro, 422 F.2d 1078, 1081 (9th Cir. 1970).

---

* Honorable William G. East, Senior Judge of the District of Oregon, sitting by designation.

1. 21 U.S.C. § 841(a)(1) provides in pertinent part:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

"(1) to manufacture, distribute or dispense . . . a controlled substance."

2. The regulation provides in pertinent part:

"(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

██ Dr. Larson made a motion for judgment of acquittal at the end of the government's case in chief, but failed to renew the motion at the end of all the evidence. Such an unrenewed motion is waived and any error in the denial of the motion is waived by the introduction of the accused's evidence. Benchwick v. United States, 297 F.2d 330 (9th Cir. 1961). Appellant now urges us to consider his insufficiency argument in light of the "plain error" rule. Rule 52(b) F.R.Crim.P.; *See* Reisman v. United States, 409 F.2d 789 (9th Cir. 1969). In the absence of "plain error" appellant can not now challenge the denial of the motion for acquittal. United States v. Lewis, 426 F.2d 266 (9th Cir. 1970). The "plain error" of Rule 52(b) is invoked only in exceptional situations, " . . . situations wherein it appears to be necessary in order to prevent miscarriage of justice or to preserve the integrity and reputation of the judicial process." Marshall v. United States, 409 F.2d 925, 927 (9th Cir. 1969). In reviewing the record we do not find that such an exceptional situation existed here requiring us to find the denial of the motion of acquittal represented "plain error" by the trial judge.

██ Appellant argues that the government was required to present expert testimony to carry its burden of proof. We do not find that expert testimony was required under the facts of this case.

In United States v. Bartee, 479 F.2d 484 (10th Cir. 1973), which also concerned the prosecution of a doctor for illegally dispensing controlled substances, the expert testimony was contradictory, but the court to some degree minimized the expert testimony by stating:

"Expert testimony from medical practitioners is of course admissible as bearing on the issue as to whether a doctor in prescribing a controlled substance is acting for a legitimate medical purpose and the expert testimony in the instant case was to some degree, at least, in conflict. *However,*

*the jury is not bound by such expert testimony and may of course consider all of the facts and circumstances surrounding the prescribing as related by lay witnesses.* In this connection, we regard certain of the utterances attributed to Dr. Bartee by Baker and Coller to be particularly damning and the overall facts and circumstances of the case are such as in our view permit the inference that Dr. Bartee in thus prescribing was not acting for a legitimate medical purpose and such was not within the usual course of his professional practice." Id. at 488–489 (Emphasis added.)

In *Bartee*, the evidence against the Doctor was deemed sufficient to sustain the conviction. The court found the following evidence significant: the inordinately large quantities of controlled substances, the spreading out of prescriptions in place of one, the use of street slang terms such as "reds", and the "most damning evidentiary matter was the testimony by agent Coller that Dr. Bartee said that he had to be careful since the BNDD (Bureau of Narcotics and Dangerous Drugs) checked the drugstores for prescriptions issued. . . ." *Id.* at 489. Dr. Bartee suggested that the prescriptions be taken to different drugstores and not filled at the same one. The court felt that the evidence was such to permit the jury's determination that the doctor was not acting for a legitimate medical purpose, and was not acting in the usual course of his professional practice.

Many of the factors considered significant in *Bartee* are present here. (1) Larson did prescribe and/or distribute inordinate quantities to the individuals named in the various counts. (2) He wrote more than one prescription on occasions in order to "spread" them out. (3) He charged a flat rate cash fee for each prescription. (4) Dr. Larson cautioned the witness Butler about having the prescription filled at the same pharmacy because each prescription was for a thirty day supply and he was supplying Butler with prescriptions more frequent-

ly than that. (R.T. 398). (5) Dr. Larson also used the street parlance for seconal: "reds"; and for methamphetamine: "speed". (R.T. 392).

Finally, some of the utterances that agents Dalton and Keszler, witness Butler, and the massage parlor witnesses testified that Dr. Larson had made, in view of the previously listed facts and circumstances, support the jury's determination that Dr. Larson was not acting for a legitimate medical purpose or in the usual course of his professional practice. Although Dr. Larson sometimes required a physical examination, certain of Dr. Larson's comments negate any significance such examinations would have with regard to legitimate medical purposes.

In United States v. Badia, 490 F.2d 296 (1st Cir. 1973), the conviction of a physician was affirmed where the principal government witness at trial was a federal agent who testified on three occasions he called on the appellant at his office and was either directly sold controlled substances from appellant's stock or sold prescriptions for controlled substances which he then had filled at various pharmacies. The court felt that the jury obviously believed the agent's testimony and its conclusions that deliveries had occurred which were not within the usual course of appellant's medical practice were warranted. The court concluded:

"Appellant's conduct bore no more resemblance to professional medical practice than the conduct of any street-corner 'pusher'." *Id.* at 299.

From our reading of the record, Dr. Larson's activities here delineated were not so dissimilar to those of the doctor in *Badia* to escape being characterized in a somewhat similar fashion.

■ Even if we were to require expert testimony, which we do not, the evidence (including testimony of the government's rebuttal witness, Dr. Ungerleider (R.T. 1026–1045)), still remains sufficient. Dr. Ungerleider's testimony reveals that Dr. Larson's prescribing of Schedule II and III controlled substances was not for legitimate medical purposes.

Appellant claims that Dr. Ungerleider's testimony only goes to the question of whether the prescribing and dispensing involved in the case was for a legitimate medical purpose and argues that the government offered no evidence that in any way tends to show that the dispensing was in other than the usual course of Dr. Larson's professional practice. We disagree.

The standard for judging what is in the usual course of a physician's professional practice was announced recently in United States v. Collier, 478 F.2d 268 (5th Cir. 1973).

"It is apparent that a licensed practitioner is not immune from the act solely due to his status, White v. United States, 399 F.2d 813 (8 Cir. 1968), but rather, because he is expected to prescribe or dispense drugs within the bounds of his professional practice of medicine. A physician is restricted to dispensing or prescribing drugs in the bona fide treatment of a patient's disease, including a dispensing of a moderate amount of drugs to a known addict in a good-faith attempt to treat the addiction or to relieve conditions or suffering incident to addiction. (citations omitted). However, under the guise of treatment a physician cannot sell drugs to a dealer nor distribute drugs intended to cater to cravings of an addict. (citations omitted). Congress did not intend for doctors to become drug pushers. (citations omitted).

"In making a medical judgment concerning the right treatment for an individual patient, physicians require a certain latitude of available options. Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973). Hence, '[w]hat constitute *bona fide* medical practice must be determined upon consideration of evidence and attending circumstances. Linder v. United States, *supra*, 268 U.S. [5] at 18, 45 S.Ct. [446] at 449, [69 L.Ed. 819]." Id. at 271, 272.

Considering the evidence presented at trial in a light most favorable to the government, we cannot conclude that Dr. Larson was prescribing drugs in the *bona fide* treatment of a patient, or within the usual course of his professional practice. The evidence, even in the absence of expert testimony, was sufficient to support the jury's determinations.

## II. *Motion for Severance*

Appellant alleges that the trial court abused its discretion in denying appellant's motion to sever the conspiracy count (Count I), and the substantive counts connected with it (Counts XI, XII, and XIII), from the remaining counts.

▆▆ Such a denial will not be reversed absent a clear showing of abuse of discretion and resulting prejudice. United States v. Berlin, 472 F.2d 13, 15 (9th Cir. 1973); United States v. Cozzetti, 441 F.2d 344, 349 (9th Cir. 1971). The burden is on the moving party to make a strong showing of prejudice. United States v. Patterson, 455 F.2d 264, 266 (9th Cir. 1972). United States v. Cozzetti, *supra,* at 349.

The evidence offered by Dr. Larson was an affidavit (R.T. 25–26) and points and authorities (C.T. 27 and 28) in support of the motion. A severance was denied on the government's representation that there would not be offered in the Government's case, *in chief,* expert testimony. (R.T. 33–34) There was none.

▆ The number of counts does not compel the conclusion that the jury was confused. The jury, aided by careful instruction by the court on relating evidence to specific counts and the elements involved in the proof of each count, was able to discriminate between the counts. This was indicated by the jury verdict of not guilty on Count V. (C.T. 40). On the record we do not think that any "strong showing of prejudice" was shown such as to require severance as a matter of law. *See* United States v. Patterson, *supra.*

## III. *Trial Judge's Participation*

It is appellant's contention that the trial judge took over from the prosecution and in a probing adversary cross-examination of the defendant took over the task of obtaining a conviction of the defendant, thus denying him a fair trial. We have carefully reviewed the transcript of the trial judge's questioning (R.T. 986–1021) and although we recognize that the trial judge took an active role in the line of questioning, we do not find an abuse of discretion.

▆▆ A trial judge walks a delicate tightrope upon questioning a witness, especially when that witness is the defendant in the case.

" 'A trial judge is more than a moderator or umpire.' His responsibility is to preside in the manner and with the demeanor to provide a fair trial to all parties and his discretion in the performance of this duty and management is wide. Robinson v. United States, 401 F.2d 248 (9th Cir. 1968), citing Smith v. United States, 305 F. 2d 197 (9th Cir. 1962)." United States v. Aguiar, 472 F.2d 553, 555 (9th Cir. 1972).

One of the functions of the trial judge is ". . . to develop facts." United States v. Sidman, 470 F.2d 1158, 1163 (9th Cir. 1972). From our review of the trial court's questioning of Dr. Larson, it is apparent that the court was attempting to develop facts that were not elicited from Dr. Larson in his prior testimony during the trial.[3]

3. This included questioning concerning the transaction with Brad Butler (R.T. 986–993); questions concerning fees charged for prescriptions (R.T. 994–998); inquiry into the medical reasons for prescribing Empirin Codeine #4 (R.T. 1001–1003); further inquiry into the significance of obtaining a prior medical history with reference to drug ingestion. (R.T. 1003–1010); questions about Terri Griffin's thyroid problem (R.T. 1011–1015); questions about Virginia Brayton's visit which were not previously asked (R.T. 1018–1019).

The court was careful to explain in instructing the jury later, that:

"It is proper to add the caution that . . . no Comment or question of the Court or ruling of the Court upon any matter of evidence is to suggest or convey in any manner what verdict I think you should find. What the verdict on the facts shall be is the sole and exclusive responsibility of the jury." (Vol. VIII, R.T. 50).

As was said by this Court in a recent opinion—(United States v. Elvira Hinton, No. 73–3206 (9th Circuit, April 24, 1974)), "While the trial judge was vigorous and forthright in his questioning of the witness, we are not persuaded that his conduct significantly prejudiced the right of the appellant-defendant to a fair trial. United States v. Allen, 431 F.2d 712 (9th Cir. 1970)."

With respect to the trial judge's questioning, we agree with the statement in *Aguiar:*

"While hindsight and prudence may dictate a less active role the record taken in its entirety shows no prejudice. . . ." 472 F.2d at 555.

█ Finally, in appellant's reply brief (p. 6), he advances the argument that the sentence imposed exceeds the statutory maximum because desoxyn, a tablet form of methamphetamine, alleged to be a Schedule II controlled substance is in actuality a Schedule III controlled substance. Appellant is mistaken. Methamphetamine, in all its forms was moved from Schedule III to Schedule II of the controlled substances list effective July 7, 1971. *See* 36 Fed.Reg. 12734 (1971); 21 C.F.R. § 308.12(d). This fact was stipulated to at the time of oral argument.

A stipulation was likewise filed by the parties hereto that the sentence imposed at time of trial was excessive.[4]

Appellant's conviction is affirmed, but his sentence is set aside and the matter is remanded to the District Court for resentencing the defendant.

---

4. It is stipulated by and between appellant and appellee, through respective counsel:

1. That the sentence of ten years imposed on each of Counts Two, Three, Four, Six and Seven and the sentence of ten years imposed upon Counts Eight, Ten, Eleven, Twelve and Thirteen to run consecutive to the sentence imposed as to Counts One, Two, Three, Four, Six and Seven are excessive inasmuch as

Counts Two, Three, Four, Six, Seven, Eight, Ten, Eleven, Twelve and Thirteen allege the distribution of Schedule II and III non-narcotic controlled substances. Pursuant to Title 21, United States Code, Section 841(b)(1)(B), the maximum sentence for distribution of Schedule II and III non-narcotic drug controlled substances is five years imprisonment and/or a $15,000 fine."